*United Bank v. Richard Buckingham, et al.*, Misc. No. 1, September Term, 2020.  Opinion by Getty, J.

**COMMERCIAL LAW – MARYLAND UNIFORM FRAUDULENT CONVEYANCE ACT – CHANGE IN LIFE INSURANCE BENEFICIARY CONSTITUTES CONVEYANCE –** Court of Appeals held that a change in a life insurance beneficiary constitutes a "conveyance" under the Maryland Uniform Fraudulent Conveyance Act, Maryland Code, Commercial Law Article ("CL") §§ 15-201 to 15-214 (1975, 2013 Repl. Vol.).  Court of Appeals concluded that a change in a life insurance beneficiary falls within the meaning of "conveyance" as defined in CL § 15-201(c).

**ESTATES & TRUSTS – GUARDIANSHIP – CHANGE IN LIFE INSURANCE BENEFICIARY–** Court of Appeals held that a guardian of property does not have the authority to change a beneficiary of a life insurance policy of the ward under Maryland Code, Estates & Trusts Article ("ET")  §  15-102 (1974, 2017 Repl. Vol.).

U.S. District Court for the District of Maryland
Case No. 8:13-cv-03227-PX
Argued: October 30, 2020

IN THE COURT OF APPEALS
OF MARYLAND

Misc. No. 1

September Term, 2020

UNITED BANK

V.

RICHARD BUCKINGHAM, ET AL.

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

Opinion by Getty, J.

Filed: March 9, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Under the Maryland Uniform Certification of Questions of Law Act,[1] this Court has the power to "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State."  CJ § 12-603.

Before us are two questions of law certified by the United States District Court for the District of Maryland ("District Court") that arise in the context of a decade-long dispute between the adult children of the Buckingham family and United Bank ("the Bank"). Through the opportune formation of various trusts, the children successfully diverted hundreds of thousands of dollars in life insurance proceeds away from the declining family business and to their personal use.  In an elaborate web of procedural history, federal and state courts both have attempted to conclusively determine whether this diversion of life insurance proceeds was an appropriate use of familial resources to assist ailing parents, or instead an act undertaken by the Buckingham children to intentionally defraud the Bank.

The first question before us is whether a change of the beneficiary designation of a life insurance policy amounts to a "conveyance" under the Maryland Uniform Fraudulent

---

[1] Maryland adopted the first version of the Uniform Certification of Questions of Law Act in 1972 as part of a uniform code promulgated by the Uniform Law Commission (also known as the National Conference of Commissioners on Uniform State Laws) and codified the Act as Article 26, §§ 161 to 172.  1972 Md. Laws, ch. 427.  The following year, Article 26 was recodified as the Courts and Judicial Proceedings Article ("CJ").  1973 Md. Laws 1st Spec. Sess., ch. 2.  In 1995, the Uniform Law Commission issued a new model Certification of Questions of Law statute, which Maryland then adopted in 1996.  1996 Md. Laws, ch. 344.  The Maryland Uniform Certification of Questions of Law Act is currently codified at CJ §§ 12-601 to 12-613, Maryland Code (1973, 2020 Repl. Vol.).

Conveyance Act ("MUFCA"),[2] particularly in light of § 16-111(d) of the Insurance Article[3] that provides for a protective exemption for the spouse and dependents of a life insurance policy holder. After conducting a plain language analysis of the definition of "conveyance" provided for in CL § 15-201(c) and reviewing the General Assembly's intent in enacting MUFCA as evidenced by the Act's legislative history, caselaw, and related statutory provisions, we hold that a change in life insurance beneficiary constitutes a conveyance under MUFCA.

The second question is whether, under § 15-102(t) of the Estates and Trusts Article,[4] a guardian of property is granted the authority to change a life insurance beneficiary on a policy of the ward. As a matter of first impression, this question relies upon an interpretation of the common law purpose of guardianship. Upon reviewing the legislative history of powers granted to guardians of property, and finding no changes to the common law, we hold that a guardian of property is not granted the authority to change a life insurance beneficiary on a policy of the ward under ET § 15-102(t).

## BACKGROUND

In accordance with CJ § 12-605(a), "the court certifying a question of law" to this Court "shall issue a certification order." Pursuant to CJ § 12-606(a)(2), the certification order must contain "[t]he facts relevant to the question, showing fully the nature of the

---

[2] Md. Code (1975, 2013 Repl. Vol.), Commercial Law ("CL") § 15-201(c) (defining "conveyance").

[3] Md. Code (1996, 2017 Repl. Vol.), Insurance ("IN") § 16-111(d).

[4] Md. Code (1974, 2017 Repl. Vol.), Estates & Trusts ("ET") § 15-102(t).

2

controversy out of which the question arose[.]"  Under these statutory mandates, this Court accepts the facts provided by the certifying court.  *See, e.g.*, *Price v. Murdy*, 462 Md. 145, 147 (2018).  Thus, we adopt the following facts set forth in a memorandum opinion accompanying the certification order of the District Court:

> This clash between the Buckingham family and the creditors of the family's deceased patriarch, John Buckingham, has now lasted more than a decade, and has played out in both state and federal court.  The crux of the dispute before this Court concerns whether diversion of the proceeds from several life insurance policies, which are among the sole remaining assets of John Buckingham and the family company, Sun Control Systems ("SCS"), was done to defraud the Bank and other creditors.  Although the background of this case has been repeated and reframed time and again, the Court summarizes the matter here to aid the Maryland Court of Appeals.
>
> John Buckingham founded SCS in 1979 and acted as President and as a Director on its board until 2009.  John was married to Elizabeth "Betty" Buckingham, and together they had five children: David, Susan, Thomas, Daniel, and Richard Buckingham.
>
> In 2008, John was diagnosed with dementia and, in 2009, this diagnosis was confirmed to be both progressive and terminal.  Around this time, Thomas Buckingham was designated to succeed John as President of SCS, although John stayed on as a Director and was never removed from the Board.
>
> By January 2010, John's condition had worsened.  He was sometimes found wandering his neighborhood or in his neighbors' homes eating from their refrigerators.  In August 2010, Betty Buckingham filed a petition for guardianship in the Circuit Court for Montgomery County.  Betty was appointed guardian of John's person, and David was appointed both temporary co-guardian of John's person and sole guardian of John's property.  In December 2010, the guardianship order was amended to make David solely the guardian of the property and Betty the temporary guardian of John's person.  In January 2011, the Circuit Court issued a final guardianship order that announced David and Betty as the co-guardians of John's person and maintained David's status as sole guardian of the property.  This order governing the guardianship of the property states that the guardian shall have "all powers and duties set forth in Md. Code Ann., Est. & Trusts § 13-214 and § 15-102."
>
> As John's mental health declined, so did SCS's financial health.  SCS's revenues fell from $15.4 million in 2006 to $8.5 million in 2009.  As of mid-2009, SCS had defaulted on loans it had secured with Virginia

Commerce Bank ("VCB"), the Bank's predecessor, and owed over $5 million to VCB. John and Betty were also personally indebted to VCB as they had on occasion guaranteed loans to SCS and had also taken out loans in their personal capacity through a home equity line of credit.

In May of 2009, SCS entered into a forbearance agreement with VCB. In the forbearance agreement, VCB agreed to refrain from collection and to increase SCS's line of credit by $750,000 in exchange for SCS's commitment to meet a specified schedule of payments. SCS's financial situation did not improve, however, and by 2010, SCS had defaulted on the forbearance agreement as well. VCB, now fearful it would lose millions of dollars through its loans to SCS, began looking to SCS's remaining assets, among them the death benefits on eight life insurance policies in John's name that are the subject of this litigation.

These life insurance policies generally fall into three groups : (1) two policies from Northwestern Mutual (the "JDB policies") that John had purchased and for which he paid the premiums; (2) four policies purchased by SCS from Northwestern Mutual (the "split dollar policies") under a "split dollar" arrangement where John named the beneficiaries but SCS "owned" the policies, paid the premiums, and upon John's death stood to recoup the premiums from the death benefits, with the remainder being paid to John's designated beneficiary; and (3) two policies from John Hancock (the "John Hancock Policies") purchased and owned by SCS and operated under a similar split dollar arrangement, with SCS recouping the premiums upon John's death.

In June 2010, as John's health declined, VCB entered into a second forbearance agreement in which VCB obtained a secured interest in death benefits payable under the JDB and split dollar policies. The effect of this agreement was to give VCB a superior position to any SCS funds, including the life insurance benefits, upon John's death.

Prior to executing the second forbearance agreement, VCB had learned of John's dementia. Outside counsel advised VCB that before entering into a second forbearance agreement, John should undergo a competency evaluation. VCB did not heed this advice. Instead, VCB entered into a fully executed second forbearance agreement. It eventually came to light that some of John's signatures on this agreement were forged. VCB, for its part, denies having any knowledge about the forgeries.

David contends he first learned of the second forbearance agreement in February 2011 when, after much back and forth, VCB provided to David the underlying documentation. David realized that the second forbearance agreement was executed when John was suffering acutely from dementia. David also recognized certain of the signatures as forgeries.

The next month, in March 2011, David, in his capacity as guardian of the property, changed beneficiaries on the eight life insurance policies to the

newly-created John D. Buckingham Life Insurance Trust ("JDB Trust") with David, Susan, and Richard as Co-Trustees. David contends that he created the JDB Trust to fund the care necessary for Betty once John died. David also made Betty the primary beneficiary and the Buckingham children contingent beneficiaries of the JDB Trust.

David next took steps to obtain accelerated death benefits to be paid from the John Hancock policies into another new trust, the "Osprey Trust," "to provide funds for [his] mother's support and meet the extraordinary cost of [John's] care." However, SCS still was owed the amount it had paid in premiums under the split dollar arrangement, which at the time totaled $280,000. Thus, if David were to obtain accelerated benefits, they could be subject to SCS's creditors such as VCB. David and Thomas knew as much; contemporaneous email correspondence between the brothers reflects their concern "[t]he bank or other creditors w[ould] end up with those funds."

SCS's Directors at the time—Thomas, Betty and David—next agreed on behalf of SCS to sell the John Hancock policies to the newly-created Osprey Trust. They approved the sale of the policies for $110,000 payable to SCS. Then David, as Trustee of the Osprey Trust, promptly obtained accelerated death benefits on the John Hancock policies for roughly seven times the amount paid to the corporation, or $709,128.65.

According to the Bank, the sale of the policies to the Osprey Trust for a fraction of the policies' value amounted to a fraudulent ploy to shield the assets from John's creditors. As evidence of the fraud, the Bank emphasizes the disparity between the $110,000 sale price and the $709,000 in valuable accelerated benefits obtained. David Buckingham, Susan Buckingham and Richard Buckingham (collectively "the Buckinghams") maintain that this sale was simply designed to provide funds to care for John and Betty. And as to the disparity between the sale price and the value of the accelerated death benefits, the Buckinghams counter that because SCS had stopped paying the premiums, the policies had a negative surrender value and were in danger of lapsing. Thus, the Buckinghams claim, it was fair and appropriate to use a well-established U.S. Treasury Formula to arrive at the $110,000 sale price.

On December 7, 2011, Betty passed away unexpectedly. The JDB Trust—which again was the beneficiary of all eight life insurance policies—was now at least partially obsolete as the vehicle to provide for Betty's care upon John's death. Thus, David, in his role as John's guardian of the property, changed the beneficiary of the insurance policies, again naming another newly created trust, the Blue Heron Trust.

Shortly after, in May 2012, David sued VCB in Montgomery County Circuit Court seeking to invalidate the assignment of the JDB and split dollar policies on the grounds that VCB entered into the second forbearance agreement knowing that John was incompetent. After a five-day bench trial

in May 2013, the Honorable [Joseph] Dugan invalidated the assignments, finding that John lacked the capacity to enter the second forbearance agreement and VCB, acting contrary to counsel's advice, knew it. The court additionally found that certain of John's signatures on the second forbearance agreement were forged. VCB's priority interest in the JDB and the split dollar policies were thus voided.

On October 17, 2012, John passed away and the remainder of death benefits on the policies were distributed. The John Hancock policies had already been paid down fully as accelerated death benefits. Northwestern paid the death benefits on the split dollar policies into the Blue Heron Trust, and the death benefits on the JDB policies into the registry of the Circuit Court in light of the pending action against VCB. In the end, no funds were available to satisfy any of VCB's sizable, outstanding loans.

(Citations omitted.)

In the memorandum opinion accompanying the certification order, the District Court provided this summary of the procedural background:

On October 30, 2013, the Bank brought suit in this Court against each of the Buckingham children individually, Susan and Richard in their capacities as representative for John's estate, and David in his capacity as trustee for the Osprey and Blue Heron Trusts. The Bank sought to invalidate both the sale of the John Hancock polices from SCS to the Osprey Trust, and the change in beneficiaries on the JDB and split dollar policies to David as Trustee of the Osprey and Blue Heron Trusts.

Counts I through III pertain to the sale of the John Hancock policies. Count I alleges that SCS, through its Directors and David as guardian of John's property, fraudulently conveyed both its ownership and beneficiary interest in the Osprey Trust in violation of the Maryland Uniform Fraudulent Conveyance Act, Md. Code Ann., §§ 15-201, *et seq*. ("MUFCA"). In Count II, the Bank alleges that David fraudulently requested and received accelerated death benefits on the John Hancock policies and, as a result, caused those benefits to be paid into the Osprey Trust, also in violation of MUFCA. And in Count III, the Bank alleges that David's change of the beneficiary of the John Hancock policies from Betty to the Osprey Trust constituted yet another violation of MUFCA.

Counts IV through V concern changes of beneficiaries on the other two sets of policies also under MUFCA. In Count IV, the Bank alleges that David fraudulently changed the beneficiary status of the split dollar policies from SCS—to which the beneficiary status lapsed upon Betty's death—to the Blue Heron Trust. In Count V, the Bank alleges that David fraudulently

6

changed the beneficiary status on the JDB policies from John's estate to the Blue Heron Trust. Finally, in Count VI the Bank alleges David breached his fiduciary duty to SCS's creditors, and in Counts VII and VIII the Bank sought a declaratory judgment that the Osprey and Blue Heron Trusts and the John Hancock policy transfers were void as beyond David's authority as guardian of the property.

The parties eventually filed cross motions for summary judgment. After a hearing on November 27, 2017 . . . [the Court] granted summary judgment in the Buckinghams' favor on all counts. As to the MUFCA counts (Counts I-V), the Court concluded that the unclean hands doctrine barred the Bank from asserting any right to the proceeds of the insurance policies. The Court reasoned that because the Bank had already attempted through "grossly inequitable conduct" to secure priority interests in the insurance policies via the second forbearance agreement, the Bank was precluded from suit to recapture its interest in this Court.

Alternatively, the Court concluded that even if the unclean hands doctrine did not apply, summary judgment in the Buckinghams' favor was nonetheless warranted on the MUFCA counts. On Count I, the Court found that no reasonable trier of fact could view the sale of the JDB policies as fraudulent because the sale was "done for fair consideration and thus is not a fraudulent conveyance as a matter of law." On Counts II through V, each as pertaining to a change of beneficiary status, the Court held that the alleged wrongful conduct fell outside the purview of MUFCA. The Court concluded that MUFCA, by its terms, only applied to "conveyances," defined as "includ[ing] every payment of money, assignment, release, transfer, lease, mortgage, or pledge *of tangible or intangible property*, and also the creation of any lien or incumbrance." Md. Code Ann., Com. Law § 15-201(c) (emphasis added). Looking to the phrase "tangible or intangible property," the Court reasoned that any "assignment, release, transfer, lease, [or] mortgage" must be a property interest to fall under this definition. Thus, and because Maryland common law suggested that a change in beneficiary status did not amount to a property interest, the Court held that the changes in beneficiary status here could not be a conveyance falling within the ambit of MUFCA. As to Counts VI through VIII, the Court held that the Bank lacked standing to either prosecute a breach of fiduciary duty action against David or seek a declaratory judgment that the transfer of the John Hancock policies, or creation of the Blue Heron and Osprey Trusts were void *ab initio*.

The Bank appealed the Court's decision to the United States Court of Appeals for the Fourth Circuit. On February 21, 2019, the Fourth Circuit reversed and remanded Counts I through V (the MUFCA counts) and affirmed the grant of summary judgment on Counts VI through VIII. As to Counts I through V, the Fourth Circuit rejected the District Court's application of the unclean hands doctrine. The Fourth Circuit next concluded

that summary judgment was inappropriate as to the sale of the John Hancock policies forming the basis of the MUFCA claim in Count I because the disparity in sale price to the Trust versus the value of the accelerated death benefits created a genuine issue of disputed fact.

As to Counts II through V, the Fourth Circuit directed that this Court on remand reconsider the propriety of summary judgment in light of "applicable Maryland estate and trust law and potentially applicable Maryland insurance law," particularly whether David exceeded the scope of his power as guardian of John's property under Md. Code Ann., Est. & Trusts § 15-102(t) (identifying the powers of a guardian of the property as to life insurance policies) and whether Md. Code Ann., Ins. § 16-111(d) (changing insurance beneficiary is "valid except for transfer with actual intent to hinder, delay, or defraud creditors") should bear on the Court's interpretation of MUFCA. As to the remaining counts, the Fourth Circuit affirmed the Court's grant of summary judgment on Count VI because the Bank waived appellate review on this claim and on Counts VII and VIII which sought unavailable declaratory relief.

On remand, both parties renewed their cross motions for summary judgment and briefed the applicability of Md. Code Ann., Est. & Trusts § 15-102(t) and Md. Code Ann., Ins. § 16-111(d). This briefing clearly demonstrated to this Court that little, if any, guidance exists as to the applicability of such provisions, and thus, for this Court to follow the Fourth Circuit's directive would amount to writing on a clean slate as to questions involving the interpretation of Maryland statutory and common law.

(Citations omitted.)

The District Court, citing the absence of controlling authority and upon the

agreement of both parties, certified the following questions of law to this Court:

1) Whether the Maryland Uniform Fraudulent Conveyance Act, *see* Md. Code Ann., Com. Law §§ 15-201 *et seq.*, which generally applies to "conveyances" made with the intent to hinder, delay, or defraud creditors, reaches a change in life insurance beneficiary particularly in light of Md. Code Ann., Ins. § 16-111(d)?

2) Whether Md. Code Ann., Est. & Trusts § 15-102 grants a guardian of property the authority to change the beneficiaries of life insurance policies?

8

**STANDARD OF REVIEW**

This Court has the power to "answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJ § 12-603. This Court may reformulate a certified question of law. CJ § 12-604. However, when answering a certified question of law, "this Court's statutorily prescribed role is to determine only questions of Maryland law, not questions of fact . . . . [And], we confine our legal analysis and final determinations of Maryland law to the questions certified." *Fangman v. Genuine Title, LLC*, 447 Md. 681, 690–91 (2016) (quoting *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 681 (2000)). Indeed, this Court "may go no further than the question certified." *Price*, 462 Md. at 147 (quoting *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 417 Md. 386, 389 n.1 (2010)).

**DISCUSSION**

Under the facts presented, the District Court asked this Court to address two matters of first impression—whether a change in life insurance beneficiary constitutes a conveyance under MUFCA and whether a guardian of property has the authority to make a change of beneficiary for a life insurance policy of the ward. For the following reasons, we answer the first question in the affirmative and the second question in the negative.

9

**A.** *First Certified Question: A Change of Life Insurance Beneficiary Constitutes a Conveyance Under the Maryland Uniform Fraudulent Conveyance Act.*

*1. Parties' Contentions.*

The appellant, the Bank, contends that a change in the beneficiary designation of a life insurance policy may constitute a fraudulent conveyance and therefore may support an action under MUFCA. The Bank draws this conclusion in reliance on its interpretation of the text of MUFCA, particularly CL § 15-201(c), that states, "'[c]onveyance' includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." The Bank further relies on the statutory relationship between MUFCA and Maryland's insurance statute to reach this conclusion, specifically IN § 16-111(d), that states "[a] change of beneficiary, assignment, or other transfer is valid except for transfer with actual intent to hinder, delay, or defraud creditors."

The appellees, the Buckinghams, contend that a change of the beneficiary designation of a life insurance policy does not amount to a conveyance and therefore cannot give rise to a claim under MUFCA. The Buckinghams assert that this Court's precedent establishes that the status of a beneficiary is merely an expectancy instead of a property interest and thus cannot be reached by a narrower reading of CL § 15-201(c). The Buckinghams further argue that life insurance proceeds are exempt from the claims of creditors under Maryland law and that the language of IN § 16-111 does not imply a right of action under MUFCA.

The parties offer competing interpretations of the definition of "conveyance" found in CL § 15-201(c). First, the Buckinghams assert that the language of the statute presents three broad categories of conveyances consisting of: (1) a payment of money; (2) an assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property; and (3) the creation of a lien or incumbrance. The Bank rejects this reading of the statute and instead urges the Court to read the language disjunctively—i.e. a conveyance may consist of any of the following: (1) a payment of money; (2) an assignment of something; (3) a release of something; (4) a transfer of something; (5) a lease of something; (6) a mortgage; (7) a pledge of tangible or intangible property; or (8) the creation of a lien or incumbrance. Thus, under the Bank's interpretation, a change in beneficiary is encompassed by the term "transfer" in CL § 15-201(c) as a transfer of the right to receive insurance proceeds from one individual to another.

Additionally, the Buckinghams argue that "includes," particularly when followed by the word "every" as provided in the definition of "conveyance" in CL § 15-201(c), is a word of limitation indicating an inclusive list of all possible categories of conveyance. By contrast, the Bank urges us to read "includes" as a word of illustration indicating a list of potential examples without an "express outer limit."

2.      *Plain Language Analysis of CL § 15-201.*

In engaging in statutory interpretation, "this Court's primary goal is to ascertain the purpose and intention of the General Assembly when they enacted the statutory provisions." *Town of Forest Heights v. Maryland-Nat'l Capital Park and Planning Comm'n*, 463 Md. 469, 478 (2019) (citing *Washington Gas Light Co. v. Maryland Pub.*

11

*Serv. Comm'n*, 460 Md. 667, 682 (2018)).  In determining the General Assembly's intent, we must first look to the natural and ordinary meaning of the language.  *Fangman*, 447 Md. at 691.  We read the "statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory."  *Town of Forest Heights*, 463 Md. at 478 (quoting *Brown v. State*, 454 Md. 546, 551 (2017)).  "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Fangman,* 447 Md. at 691 (citations and brackets omitted in the original).  Lastly, "statutory construction is approached from a 'commonsensical' perspective.  Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Della Ratta v. Dyas*, 414 Md. 556, 567 (2010).

The following definitions for the statutory language in MUFCA are provided at CL § 15-201:

> (a) In this subtitle the following words have the meanings indicated.
> (b) (1) "Assets" **means** property of a debtor not exempt from liability for his debts.
>     (2) "Assets" **includes** any property to the extent that the property is liable for any debts of a debtor.
> **(c) "Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.**
> (d) "Creditor" **means** a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent.
> (e) "Debt" **includes** any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent.

(Emphasis added.)

We begin our plain language analysis by considering the parties' alternative interpretations of the word "includes" in CL § 15-201(c).  We note that "a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Kushell v. Dep't of Nat. Res.*, 385 Md. 563, 577 (2005) (citing *Deville v. State*, 383 Md. 217, 223 (2004)).

Here, we look to the entirety of CL § 15-201 to ascertain the intent of the General Assembly.  Notably, "includes" appears in three provisions of this definitional subsection of MUFCA, and "means" appears twice.  Specifically, in analyzing the definition of "assets" in CL § 15-201(b)(1) and (2), we determine that the two words—"includes" and "means"—cannot be used interchangeably as the Buckinghams assert.  CL § 15-201(b)(1) states, "'[a]ssets' *means* property of the debtor not exempt from liability for his debts." (Emphasis added.)  By contrast, CL § 15-201(b)(2)—directly following—states, "'[a]ssets' *includes* any property to the extent that the property is liable for any debts of a debtor." (Emphasis added.)  Reading these two provisions side by side, it is apparent to us that the General Assembly intended to use "means" as a limiting term and "includes" as a contrasting and, therefore, illustrative term.[5]  The General Assembly has provided meanings for certain words throughout the code and "includes" or "including" are within

---

[5] We acknowledge that "includes" is only modified by "every" once in this subsection. However, we reject the argument that "includes every . . ." is synonymous with "means." It is well established that the "General Assembly is presumed to have meant what it said and said what it meant." *Bellard v. State*, 452 Md. 467, 481 (2017) (quoting *Wagner v. State*, 445 Md. 404, 418 (2015)).  If the General Assembly desired to communicate an identical meaning in these instances, it would have utilized consistent terminology.

this list defined as: "'[i]ncludes' or 'including' means includes or including by way of illustration and not by way of limitation." Md. Code (2014, 2019 Repl. Vol.), General Provisions § 1-110. Consequently, we find that in CL § 15-201(c) the word "includes" is used to indicate several examples of potential conveyances as opposed to signaling an inclusive list of all potential conveyances to follow.

Our interpretation is reinforced by the language defining "conveyance" in CL § 15-201(c). The Buckinghams urge us to read this provision as three separate categories of conveyances, the first pertaining to money, the second to property, and the third to liens or incumbrances. To support this reading, the Buckinghams assert the qualifying phrase—"of tangible or intangible property"—modifies each term in the preceding list, including "assignment," "release," "transfer," "lease," "mortgage," and "pledge."

However, we reject the Buckinghams' reading of CL § 15-201(c) because it fails to give weight to the "generally recognized rule of statutory construction that a qualifying clause ordinarily is confined to the immediately preceding words or phrase—particularly in the absence of a comma before the qualifying phrase." *Md. Dep't of the Env't v. Underwood*, 368 Md. 160, 175–76 (2002) (quoting *Sullivan v. Dixon*, 280 Md. 444, 451 (1977)). Here, the qualifying phrase—"of tangible or intangible property"—is not set off by commas, and therefore it only modifies the immediately preceding term "pledge."

Next, we note the use of the conjunction "or" between "mortgage[]" and "pledge" and the absence of a conjunction between "money[]" and "assignment." As written, the provision contains one long string of terms leading up to the disjunctive "or," with no grammatical or structural indication given that a "payment of money" should be held apart

14

from the grouping of "assignment, release, transfer, lease, mortgage, or pledge." Accordingly, it would be inconsistent to give one meaning to "payment of money" (i.e. it is a stand-alone term) and another meaning to the rest of the terms (i.e. each are subject to the qualifying phrase). Instead, we find the consistent use of commas here without the presence of a conjunction to mean each item in the string of terms is to be read disjunctively.

Thus, after a detailed review of the plain language of CL § 15-201, we conclude that the use of the term "includes" and the disjunctive nature of the language in CL § 15-201(c) demonstrate the purpose of the General Assembly to provide illustrative examples of conveyances without any intent to limit the phrase "transfer" to "tangible or intangible property." Therefore, the transfer of the right to receive insurance proceeds from one individual to another by altering the beneficiary designation on a life insurance policy falls within the definition of "conveyance" provided in CL § 15-201(c).

*3.    Legislative Intent of MUFCA.*

While this Court "begin[s] our analysis by first looking to the normal, plain meaning of the language of the statute," we sometimes "see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language." *Brown v. State*, 454 Md. 546, 551 (2017) (quoting *Phillips v. State*, 451 Md. 180, 196–97 (2017)). More specifically, this Court may analyze "the context of a statute . . . and archival legislative history of relevant enactments." *Town of Forest Heights*, 463 Md. at 478 (quoting *Brown*, 454 Md. at 551). Here, we further clarify the General Assembly's intent

15

in enacting MUFCA by reviewing the Act's legislative history and considering the caselaw of this Court.

A comprehensive review of MUFCA's legislative history reveals Maryland first adopted the Uniform Fraudulent Conveyance Act in 1920 as part of the uniform laws promulgated by the Uniform Law Commission (also known as the National Conference of Commissioners on Uniform State Laws). 1920 Md. Laws, ch. 395. In 1924, the Uniform Fraudulent Conveyance Act was codified as Article 39B. The statutory language of Article 39B § 1, which is the definitional provision of the Act, remained entirely unaltered throughout several later recodifications occurring in 1939, 1951, and 1957. Md. Code (1939), Art. 39B § 1; Md. Code (1951), Art. 39B § 1; Md. Code (1957), Art. 39B § 1.

In 1975, as part of Maryland's code revision,[6] the General Assembly repealed Article 39B in its entirety and reenacted the provisions of MUFCA as §§ 15-201 to 15-214 of the Commercial Law Article. 1975 Md. Laws, ch. 49. In addition to a bill containing the text of the statute to create the Commercial Law Article, the Commission to Revise the Annotated Code of Maryland also submitted a report to the General Assembly that included

---

[6] As we have noted in the past, "[c]ode revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it." *Nationwide Mut. Ins. Co. v. Shilling*, 468 Md. 239, 251 n.9 (2020) (quoting *Johnson v. State*, 467 Md. 362, 381 n.8 (2020)). "Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services. Code Revision was completed in 2016 with the enactment by the General Assembly of the Alcoholic Beverages Article." *Id.*

section-by-section notes (known as "Revisor's Notes") documenting its work. The report expressed this overall goal for MUFCA: "[t]he Commission has refrained from making many changes to this Act, even of a purely stylistic nature, in accordance with its policy regarding Uniform Acts. Those few changes which have been made are, of course, explained in the revisor's notes." William S. James & Avery Aisenstark, Governor's Commission to Revise the Annotated Code of Maryland, *Commission Report No. 1975-1 to the General Assembly of Maryland* 40 (January 10, 1975).

In addition, the 1975 Maryland Chapter Laws contain the Reviser's Notes concerning the definitions provided in CL § 15-201 that we have analyzed above. The notes state, "[t]his section presently appears as Art. 39B, § 1. Subsection (b) of this section is divided into two paragraphs for the purpose of clarity. The only other changes are technical changes in style." 1975 Md. Laws, ch. 49.

In comparing Article 39B § 1 and CL § 15-201, we can confirm the accuracy of the Revisor's Notes by identifying the few minor changes that were made by the commission. First, the wording of subsection (b) was rearranged and broken into two paragraphs.[7]

---

[7] The original language of subsection (b) reads:

> In this article "*assets*" of a debtor means property not exempt from liability for his debts. To the extent that any property is liable for any debts of the debtor, such property shall be included in his assets.

Md. Code (1957), Art. 39B § 1 (emphasis in original).

The commission altered the language of subsection (b) to read:

Second, a comma was inserted immediately following "mortgage" in subsection (c). Third, the word "means" replaced the word "is" in subsection (d), and lastly a comma was inserted immediately following "fixed" in subsection (e). However, as noted in both the commission's report and the Revisor's Notes, none of these changes were intended to be substantive. Therefore, these changes do not alter the original legislative intent of MUFCA dating back to its predecessor's enactment in 1920.

To discern the intent of the General Assembly in enacting the original Uniform Fraudulent Conveyance Act in 1920, we turn to caselaw for helpful context. This Court has long recognized that the purpose of fraudulent conveyance law is to preserve the rights of creditors. In 1939, this Court concluded that the Maryland fraudulent conveyance statutes "were designed to render null and void conveyances made for the purpose of hindering, delaying and defrauding creditors." *Kennard v. Elkton Banking & Trust Co.*, 176 Md. 499, 500 (1939). In 1973, this Court again reiterated that in enacting these statutes, the Legislature "was not restricting the legal or equitable remedies already available to the creditor," and the "objective . . . [was] to enhance and not impair the remedies of the creditor." *Damazo v. Wahby*, 269 Md. 252, 256–57 (1973).

---

(1) "Assets" means property of a debtor not exempt from liability for his debts.
(2) "Assets" includes any property to the extent that the property is liable for any debts of a debtor.

Md. Code (1975, 2013 Repl. Vol.), CL § 15-201(b).

In light of this caselaw, we conclude that the Buckinghams' interpretation of the term "conveyance" in CL § 15-201(c) conflicts with the General Assembly's purpose in enacting MUFCA. If this Court were to find that a transfer of the right to receive life insurance proceeds does not constitute a conveyance under MUFCA, then it would be difficult for the creditors of policy holders to have any remedy for the fraudulent change of a life insurance beneficiary. Therefore, our reading of the term "conveyance" in CL § 15-201(c) to include the transfer of the right to receive life insurance proceeds through a change in beneficiary is consistent with the General Assembly's intent to enhance, rather than impair, the remedies of creditors.

4.      *Statutory Analysis of IN § 16-111(d).*

In the first certified question, the District Court also asks us to interpret IN § 16-111(d) as it relates to CL § 15-201(c). IN § 16-111 provides:

> (a) The proceeds of a policy of life insurance or under an annuity contract on the life of an individual made for the benefit of or assigned to the spouse, child, or dependent relative of the individual are exempt from all claims of the creditors of the individual arising out of or based on an obligation created after June 1, 1945, whether or not the right to change the named beneficiary is reserved or allowed to the individual.
> (b) For purposes of this section, proceeds include death benefits, cash surrender and loan values, premiums waived, and dividends, whether used to reduce the premiums or used or applied in any other manner, except if the debtor has, after issuance of the policy, elected to receive the dividends in cash.
> (c) This section does not prohibit a creditor from collecting a debt out of the proceeds of a life insurance policy pledged by the insured as security for the debt.
> **(d) A change of beneficiary, assignment, or other transfer is valid except for transfer with actual intent to hinder, delay, or defraud creditors.**

(Emphasis added.)

19

Generally, IN § 16-111 provides an exemption to fraudulent conveyance law shielding the spouse, child or dependent relatives of a life insurance policy holder from creditors of the policy holder. However, subsection (d) is of import to the question at hand because it removes this protective exemption if a change of life insurance beneficiary is made fraudulently. While we agree with the Buckinghams' assertion that perhaps no additional remedies are expressly created by this subsection, IN § 16-111(d) nonetheless underscores the General Assembly's express rejection of the limitation on a creditor's remedies in the event of a fraudulent transfer of life insurance beneficiary. Therefore, it follows that for IN § 16-111(d) to have any meaningful effect, a remedy for defrauded creditors must be available elsewhere under Maryland law. Based on our earlier plain language analysis of CL § 15-201(c), we conclude that one such remedy is available under MUFCA.

Additionally, we find support for our statutory interpretation of CL § 15-201(c) in the parallel language contained within IN § 16-111(d) and CL § 15-207 of MUFCA. CL § 15-207 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

Notably, identical language is used to describe both fraudulent conveyances in CL § 15-207 and fraudulent transfers of life insurance beneficiaries in IN § 16-111(d). Both discuss the "intent . . . to hinder, delay, or defraud . . . creditors." At minimum, this language is indicative of overlapping core characteristics that support the assertion that a

20

fraudulent transfer of life insurance beneficiary may fairly be characterized as a fraudulent conveyance. Thus, in considering both the General Assembly's purpose in enacting MUFCA and MUFCA's textual parallels to IN § 16-111(d), we find strong support for our earlier plain language analysis of CL § 15-201(c). Accordingly, we determine that a change of life insurance beneficiary is a conveyance under MUFCA.

**B.** ***Second Certified Question: A Guardian of Property Does Not Have the Authority to Change the Beneficiary of a Life Insurance Policy of the Ward.***

*1. Parties' Contentions.*

The Bank contends that a guardian of property does not have the power to change life insurance beneficiaries of a ward, especially if such change is for the benefit of someone other than the ward or the ward's dependents. The Bank points out that ET § 15-102 provides the powers of a court-appointed guardian of property in administering the fiduciary estate of a ward and the language of ET § 15-102(t), which lists powers pertaining to life insurance policies, meaningfully omits an express grant to change a policy beneficiary.

Specifically, ET § 15-102(t) provides:

> A fiduciary may exercise options, rights and privileges contained in a life insurance policy, annuity, or endowment contract constituting property of the fiduciary estate, including the right to obtain the cash surrender value, convert a policy to another type of policy, revoke any mode of settlement, and pay any part or all of the premiums on the policy or contract.

The Bank emphasizes that none of the powers listed in ET § 15-102(t) involve dispersing property from the estate without consideration of property in return, such as, for example,

21

changing a life insurance beneficiary designation to someone other than the ward's dependents.

Instead, a guardian's powers to distribute or disperse the property of a ward without court authorization are provided for in ET § 13-214. The Bank maintains the power to change a life insurance beneficiary, particularly when diverting funds away from the estate, is notably absent. However, the Bank contends that the court may exercise the power to change a life insurance beneficiary on a policy of an incompetent ward under ET § 13-203(c)(1) which reads:

> Except for the limitations contained in § 13-106 of this title, after appointment of the guardian, the court has all the powers over the property of the minor or disabled person that the person could exercise if not disabled or a minor.

As a result, the Bank argues the only proper course of action for a guardian seeking to change the beneficiary on a life insurance policy of the ward would be to seek permission of the court.

On the other hand, the Buckinghams assert that ET § 15-102(t) grants a guardian the power to change the beneficiary designation on a life insurance policy of the ward because the statutory language clearly permits the guardian to do so. The Buckinghams construe the General Assembly's use of the term "including" as illustrative rather than limiting, and therefore maintain that ET §15-102(t) grants a guardian the authority to exercise "options, rights and privileges contained in a life insurance policy" in addition to

those listed, including the option to change a beneficiary designation.[8]  Moreover, the Buckinghams argue that death benefits are only realized upon the death of the ward at which time they are distributed to a party other than the ward.  With that in mind, they assert that the death benefits are not an asset of the guardianship estate.

    2.      *Legislative History of Powers of Guardian of Property.*

For centuries, the common law purpose of guardianship has remained unaltered.  A guardian of an incompetent ward has a fiduciary duty to guard and protect the estate of the ward.  As the legislative history outlines below, a guardian of the property does not have the ability to change the beneficiary designations of a ward's life insurance policy without court approval because the guardian did not have such powers under common law and the General Assembly has not conferred such powers in subsequent statutes addressing the powers of a guardian.  "It is a generally accepted rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared . . . .'" *Robinson v. State*, 353 Md. 683, 693 (1999) (quoting *Lutz v. State*, 167 Md. 12, 15 (1934)).

To comprehensively analyze the role of a guardian of property we must begin with Maryland's adoption of English common law under Article 3 of the Declaration of Rights in the Maryland Constitution in 1776.  *Nickens v. Mount Vernon Realty Grp., LLC*, 429 Md. 53, 65 n.11 (2012) (abrogated on other grounds).  In 1867, the language of Article 3 was reconstituted as Article 5.  *Id.*  Article 5(a) of the Declaration of Rights now provides:

---

[8] Regardless of whether the term "including" in ET § 15-102(t) was intended by the General Assembly as a term of illustration, we conclude that the power to change a life insurance beneficiary on a policy of a ward is not an option, right, or privilege granted to a guardian of property for reasons fully explained in this opinion.

> That **the Inhabitants of Maryland are entitled to the Common Law of England**, and the trial by Jury, according to the course of that Law, and to the benefit of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; **subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State**. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore.

Md. Const. Declaration of Rights Art. 5(a) (emphasis added). As we have stated in the past, "Article 5(a) enumerates three bodies of law to which the people of Maryland are entitled[,]" the first of which is the English common law. *Davis v. Slater*, 383 Md. 599, 612 (2004). In 1821, we noted that the term "Common Law of England" referred to "the common law in mass, as it existed here, either potentially or practically, and as it prevailed in England at the time, except such portions of it as are inconsistent with the spirit of that instrument [the Declaration of Rights], and the nature of our new political institutions." *Id.* (quoting *State v. Buchanan*, 5 H. & J. 317, 358 (1821)). Thus, with the 1776 adoption of the language of Article 5(a), Maryland adopted the then-existing English common law principles of guardianship which were not inconsistent with the Maryland Declaration of Rights or the new political institutions, and such principles remain law so far as the Maryland legislature has not revised, amended or repealed them. *See id*. at 614 (quoting *Balt. Sun Co. v. Mayor & City Council of Balt.*, 359 Md. 653, 662 (2000)) ("This Court has continually observed that '[a]though the inhabitants of Maryland are entitled to the

24

common law, that law is subject to modification by legislative acts or by decisions of this Court.'").

Pertinent to our assessment of English common law principles of guardianship and within the context of surveying the historical role of the King as a guardian of property, this Court has explained:

> The statute of Edward II, *De Praerogativa Regis*, was one of the statutes adopted in Maryland under Art. 5 of the Declaration of Rights. It provided, in effect, that under the King's custodianship, the lands and tenements of lunatics should be 'safely kept without Waste and Destruction, and that they and their Household shall live and be maintained competently with the Profits of the same.' The declared purposes of the statute were to prevent alienation of the property, and to insure [sic] its return to the incompetent if he should recover, or to his heirs if he should die insane.

*Kelly v. Scott*, 215 Md. 530, 535 (1958) (emphasis in original) (citations omitted). This reference reveals the long-established English common law principle underlying the concept of guardianship—specifically, that the purpose of guardianship is to ensure the estate of the ward is preserved and not diminished. We now consider any legislative alterations to this principle following its adoption under the Declaration of Rights in 1776.

For many decades, Maryland lawyers and judges operated without an organized or regularly published code. The first official code compiling Maryland state laws was not published until 1860. *See Hoang v. Lowery*, 469 Md. 95, 108 (2020). However, regular efforts to update the 1860 code quickly ceased, rendering it outdated within a few years. *See* Alan M. Wilner*, Blame it All On Nero: Code Creation and Revision in Maryland* (1994), https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/html/history.html [https://perma.cc/F32A-M4A7]. Thus, prior to the publication of the first complete,

25

annotated Maryland Code in 1924, lawyers and courts relied on treatises authored by individual legal scholars to ascertain the current state of law. *Id.* As a result, scholarly treatises provide pertinent historical insight on the development of law prior to 1924.

Of particular relevance to the question at hand, Edward Otis Hinkley wrote a treatise in 1878 entitled *The Testamentary Law and the Law of Inheritance and Apprentices in Maryland*, that comprehensively surveyed Maryland statutes and caselaw, often quoting this Court. Edward Otis Hinkley, *The Testamentary Law and the Law of Inheritance and Apprentices in Maryland* (John Murphy & Co., 1878). We find part six—"Guardians and Wards"—and specifically chapter fifty-seven, which closely considers the duties and powers of guardians, to be instructive. At the beginning of this chapter, Hinkley provided a detailed index, similar to modern headnotes, containing twelve references to the 1860 code and twenty-six references to caselaw. *Id.* at 536–37. Citing both code and caselaw, Hinkley wrote:

> As it is the unquestionable province of a guardian, under our laws, to take care of the person of his ward, so it peculiarly belongs to his office to keep together and preserve the property of every kind and description.

*Id.* at 541. Thus, Hinkley's synthesis of the law evidences that the English common law purpose of guardianship, while derived originally from the role of the King, was fully embraced by both the Maryland legislature and this Court as of 1878.

The Buckinghams argue that later provisions provided through guardianship reform gave broad powers to guardians. The Bank counters that these broad powers were granted under the doctrine of substituted judgment, which does not extend to the change of a life insurance beneficiary. This Court addressed the doctrine of substituted judgment in

26

*Kelly v. Scott*, a 1958 opinion written by Judge William L. Henderson, which relied on English common law principles to interpret the role of a guardian under Maryland law. 215 Md. 530. As a matter of first impression, the *Kelly* Court rejected the legal doctrine of substituted judgment—a rule that emerged under an 1816 English case and broadened the role of a guardian by allowing the distribution of an incompetent ward's estate for the benefit of someone other than the ward. *See id.* at 533. The Court found that the 1816 English case was irrelevant because it was not in force at the time of Maryland's adoption of English common law in 1776. *Id.* at 535–36. Noting the English common law duty of a guardian to preserve and maintain the estate of the ward, the Court held "the expenditure of surplus income for the benefit of persons other than the [ward] and his household" was not authorized under Maryland law. *Id.* at 535. The Court also noted that the lack of legal authority for the doctrine of substituted judgment, if warranted, could only be remedied by the legislature. *Id.* at 537.

Immediately following the *Kelly* decision, the Maryland General Assembly passed legislation that codified the substituted judgment doctrine. *Scott v. First Nat'l Bank*, 224 Md. 462, 464 (1961); 1958 Md. Laws, ch. 93. The new statute authorized a court in equity to approve of the disbursement of a ward's surplus income by a guardian of property in hardship cases. 1958 Md. Laws, ch. 93. These court-authorized additional payments of support and maintenance could be made to "such person, or persons as the incompetent [ward] would reasonably have been expected to make had he been in a sound state of mind and capable of managing his affairs." *Id.* While this statutory provision modified the effect of *Kelly* where facts supporting substituted judgment arise, it did not modify the purpose

27

of guardianship *Kelly* had so clearly defined from a historical review of English common law. While the General Assembly granted substituted judgment to guardians of property, it did so with limitations that did not extend to changing the beneficiary on a life insurance policy of a ward.

In the years after the *Kelly* decision and the subsequent legislation adopting the substituted judgment doctrine, guardianship law underwent several phases of statutory and code revision by the Maryland General Assembly. In 1969, the General Assembly entirely overhauled Maryland's testamentary law, revising Article 93 and adding Article 93A, in conformance with a report and recommendations produced by a gubernatorially appointed Commission chaired by Judge Henderson and thus known as the "Henderson Commission."[9] *Piper Rudnick LLP v. Hartz*, 386 Md. 201, 222 (2005). In its report, the Henderson Commission provided comments following Section 7-401 of Article 93, the statutory provision detailing the powers of guardians including those related to life insurance policies, stating that the commission relied on the 1969 Uniform Probate Code and "substantially adopt[ed] the assumption of the Uniform Trustees' Powers Act that it is desirable to equip fiduciaries with the authority required for the prudent handling of assets." Governor's Commission to Review and Revise the Testamentary Law of Maryland, *Second Commission Report on Article 93 Decedents' Estate to the Governor*

---

[9] This 1969 reform included a "comprehensive revision of the Maryland law relating to guardianships . . . for the protection of the property" of incompetent or disabled wards and it collected "into one article all the diverse Maryland rules" pertaining to guardians of property. Shale D. Stiller and Roger D. Redden, *Statutory Reform in the Administration of Estates of Maryland Decedents, Minors and Incompetents,* 29 Md. L. Rev. 85, 116 (1969).

*and the General Assembly of Maryland* 110–11 (December 5, 1968), http://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=6570 [https://perma.cc/6CH3-H2CW]. This foundational assumption relied upon by the Henderson Commission aligned with the common law purpose of guardianship—preservation and maintenance of a ward's estate—provided for in *Kelly*.

In 1974, as part of Maryland's code revision, the General Assembly repealed Articles 93 and 93A and reenacted them as the Estates and Trusts Article. 1974 Md. Laws, ch. 11. The Revisor's Notes pertaining to ET § 15-102 indicate that no substantive changes were made to subsection (s) detailing a guardian's powers relating to life insurance policies of the ward, which now exists as ET § 15-102(t). *Id.* Additionally, what is currently ET § 15-102 originated, in part, as Section 213 of Article 93A of the 1969 version of the Annotated Code of Maryland. Comments on Section 213 made by the Estate and Trusts Section of the State Bar Association record that the statute was "intended to give to guardians a broad catalogue of powers" in order to "permit the prompt and inexpensive administration of the estates of minors and disabled persons." Maryland State Bar Association, *Report of the Section on Estates and Trusts of the Maryland State Bar Association on Guardianship and Other Protective Devices for Persons under Disability* 7 (1968), http://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=6805 [https://perma.cc/7RN6-DBEY] The legislative history of ET § 15-102 indicates the General Assembly desired for management of guardianship estates to be more simplified and that assets were intended to be handled in a prudent manner for the benefit of the incompetent's estate consistent with the traditional purpose of guardianship originating in

English common law. This fundamental purpose of guardianship was confirmed in the Edward Otis Hinkley treatise of 1878, reiterated in *Kelly* and then again restated as recently as 2000 by the Court of Special Appeals. *Seaboard Sur. Co. v. Boney*, 135 Md. App. 99, 112 (2000) ("[T]he fundamental duty of a guardian of property is to preserve the property in the guardianship estate for the benefit of the ward and other persons with an interest in that property.").[10]

---

[10] Despite several phases of guardianship reform in Maryland over a period of fifty years, the fundamental common law principle of preservation of the estate has remained unaltered. In 1994, the Maryland Office of Aging convened the Task Force on Guardianship to assess the current guardianship laws and develop legislation to achieve "comprehensive statutory reform." Vicki Gottlich, *The Role of the Attorney for the Defendant in Adult Guardianship Cases: An Advocate's Perspective*, 7 Md. J. Contemp. Legal Issues 191, 191 n.1 (1995–96). The Task Force on Guardianship was further divided into subcommittees, and the subcommittee for Reform of the Maryland Guardianship Statute made substantive recommendations for change. *See id.* at 191. *See also* Joyce McConnell, *Standby Guardianship: Sharing the Legal Responsibility for Children*, 7 Md. J. Contemp. Legal Issues 249, 249 (1995–96). Then in 1996, another comprehensive reform of guardianship law took place with the adoption of Title 10 of the Maryland Rules, which reorganized existing rules and created new rules pertaining to guardianship. *See* 23:14 Md. Reg. 1, 13–37 (July 5, 1996).

More recently, in 2016 a judicial interdisciplinary workgroup called the *Guardianship/Vulnerable Adults Workgroup of the Maryland Judicial Council's Domestic Law Committee* completed a report recommending twenty-five comprehensive changes to the practice of guardianship, which were all adopted as amendments to Title 10 of the Maryland Rules and became effective on January 1, 2018. *See* Maryland Judicial Council-Domestic Law Committee, *Guardianship Work Group Report and Recommendations*, https://mdcourts.gov/sites/default/files/import/judicialcouncil/pdfs/workgroups/guardians hipreportrecommendations201605.pdf [https://perma.cc/U6ZS-4LYD]; *see also* Maryland Courts, *Guardianship Information for Courts*, https://www.courts.state.md.us/family/guardianship/guardianshipinformationforcourts [https://perma.cc/YG5S-MW4T].

The workgroup was divided into three subgroups, one of which was devoted to the improvement of the law surrounding guardians of property, and the subgroups formulated recommendations for best practices in Maryland after careful review of other states' statutory provisions and general best practice literature. *Maryland Judicial Workgroup*

Looking to other statutory provisions contained in the Estates and Trusts Article, we note that ET § 13-214 provides the limited scope of a guardian's powers to disperse property of the ward without court authorization. Markedly absent from these independent powers is the ability of a guardian to change the beneficiary designation of a life insurance policy of a ward. We agree with the Bank's assertions and find that the authority to change a beneficiary designation on a life insurance policy of a ward following the appointment of a guardian belongs exclusively to the court. As previously referenced, ET § 13-203(c)(1) states, "[e]xcept for the limitations contained in § 13-106 of this title, after appointment of the guardian, the court has all the powers over the property of the minor or disabled person that the person could exercise if not disabled or a minor." This provision demonstrates the General Assembly's intent to safeguard the ward's estate by the broad grant of authority to courts and the conversely limited grant of authority to guardians of property. Thus, we find further support for our conclusion that a guardian does not have the authority to change the beneficiary designation on a life insurance policy of the ward absent court authorization.

Finally, we consider that the Uniform Probate Code, both as it existed in 1969 when the Henderson Commission relied upon it and the current version, expressly require court

---

*Spearheads Guardianship Reforms*, 39 Bifocal 26, 27 (2018), https://www.americanbar.org/content/dam/aba/publications/bifocal/final-bifocal_39_3.pdf. [https://perma.cc/5U77-5T2R]. This workgroup, like all previous reform efforts, did not propose providing authority to guardians to change beneficiary designations for wards.

authorization prior to a change in life insurance beneficiary on a policy of a ward. Unif. Probate Code § 5-408(4) (1969); Unif. Probate Code § 5-411 (last amended 2019) (2020). We note other states have recognized this approach. Wisconsin's highest court has stated, "[i]n our opinion a guardian has no more authority to designate a beneficiary in a policy of insurance upon the life of a ward than he would have to change the will of his ward by executing a codicil thereto or by executing a wholly new will." *Kay v. Erickson*, 244 N.W. 625, 626 (Wis. 1932). Likewise, although a state statute dictated an alternate outcome, a Texas intermediate appellate court nonetheless observed, "[i]t appears to be the generally accepted rule . . . that the guardian of an incompetent may exercise the right to change the beneficiary designated in a policy on the life of the incompetent if by the change the ward is benefited, and if the guardian is duly authorized to make such a change of beneficiary by a court of competent jurisdiction." *Salvato v. Volunteer State Life Ins. Co.*, 424 S.W.2d 1, 4 (Tex. 1st. Ct. App. 1968). We agree with this rule and, as before noted, in accordance with ET § 13-203(c)(1), a guardian may apply to the court to change a beneficiary on a life insurance policy of the ward.

In sum, the role of a guardian to maintain and preserve the estate of the ward originated with English common law and was incorporated into Maryland law under the Declaration of Rights. This purpose of guardianship has been consistently referenced in caselaw and has remained unaltered after five decades of guardianship law reform. Consequently, we find that ET § 15-102(t) does not provide a guardian with the power to change a beneficiary designation. Thus, we agree with the Bank and conclude that a

32

guardian of property does not have the authority to change the beneficiary on a life insurance policy of the ward.

## CONCLUSION

For the foregoing reasons, we answer the first question certified to us by the District Court in the affirmative and hold that a change in life insurance beneficiary constitutes a conveyance under CL § 15-201(c) of MUFCA. Additionally, we answer in the negative to the second question certified to us by the District Court and hold that the guardian of property does not have the authority to change the beneficiary on a life insurance policy of a ward under ET § 15-102(t).

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**