*In re: Scarlett B. Bowman*, Misc. No. 26, September Term, 2025.

**MORTGAGE LOANS – MARYLAND MORTGAGE LENDER LAW – LICENSING REQUIREMENTS – MORTGAGE LENDERS**

The Appellate Court of Maryland's decision in *Estate of Brown v. Ward*, 261 Md. App. 385 (2024) had no effect on the Maryland Mortgage Lender Law, Md. Code Ann., Fin. Inst. §§ 11-501 – 11-524. In *Brown*, the Appellate Court held that passive trusts may be "credit grantors" and subject to licensure under a different statutory scheme. That holding does not implicate whether the Maryland Mortgage Lender Law's licensing requirements for "mortgage lenders" include passive trusts.

**MORTGAGE LOANS – MARYLAND MORTGAGE LENDER LAW – LICENSING REQUIREMENTS – PASSIVE TRUSTS**

The unambiguous text of the Maryland Mortgage Lender Law did not require passive trusts to obtain a mortgage lender license before the effective date of the Maryland Secondary Market Stability Act of 2025, 2025 Md. Laws, Ch. 119.

United States Bankruptcy Court for the District of Maryland
Case No. 25-12629-NVA
Argued: March 6, 2026

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 26

September Term, 2025

_____

IN RE: SCARLETT B. BOWMAN

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: June 23, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The General Assembly enacted the Maryland Secondary Market Stability Act of 2025, 2025 Md. Laws, Ch. 119, to "clarify" that passive trusts to which mortgage loans are assigned are not required to obtain a license under the Maryland Mortgage Lender Law, Md. Code Ann., Fin. Inst. §§ 11-501 – 11-524 (2020 Repl.; 2025 Supp.). The central question before us is whether passive trusts—trusts that hold assets (in this case, mortgage loans) but that do not actively manage the assets or take on any administrative duties related to them—were required to obtain such a license before the effective date of the Secondary Market Stability Act. Our answer is that they were not.

The origins of the present dispute lie in a legislative change that the General Assembly made in response to an executive agency's interpretation of the Appellate Court of Maryland's opinion in *Estate of Brown v. Ward*, 261 Md. App. 385 (2024). In *Brown*, the Appellate Court held that passive trusts are required to obtain a mortgage lender license under a different licensing scheme than the Mortgage Lender Law when they meet the definition of a "credit grantor" under that separate scheme and hold debt secured by real property. *Id.* at 427. The Maryland Office of Financial Regulation (the "Office") concluded that the reasoning of the *Brown* decision extended to all mortgage loans, not just those governed by the licensing scheme at issue in that case. As a result, in early 2025, the Office promulgated emergency regulations to provide for the licensure of all assignees of mortgage loans, including passive trusts. In response to the Office's interpretation of *Brown* and concern about the effect on the mortgage industry, the General Assembly promptly enacted the Secondary Market Stability Act, which expressly exempts passive trusts from the licensing requirements of the Mortgage Lender Law.

This case comes to us by way of certified questions from the United States Bankruptcy Court for the District of Maryland. In that court, debtor Scarlett Bowman filed for bankruptcy. Ms. Bowman listed as an asset a piece of residential real property that is subject to a note and deed of trust held by a creditor passive trust called Towd Point Mortgage Trust 2016-4, U.S. Bank National Association ("Towd").[1] Towd filed a proof of claim asserting the right to collect interest and fees on the mortgage loan, in addition to principal. In response, relying on *Brown* and the Office's guidance, Ms. Bowman asserted that Towd had forfeited the right to collect interest and fees because it was not properly licensed under the Mortgage Lender Law. Towd did not dispute that it was unlicensed, but argued that no license was required. Because Ms. Bowman's claim and Towd's objection raise questions of first impression under Maryland law, the Bankruptcy Court certified two questions of law to this Court:

> 1. Because the [Maryland Secondary Market Stability] Act purports to "clarify" the licensing exemption after *Brown*, does that mean the General Assembly successfully restored the licensing exemption for passive trusts as if *Brown* had not been decided?

> 2. Assuming the Act merely exempts passive trusts from the licensing requirement as of the date it was enacted, are passive trusts precluded from collecting interest and fees for the period prior to the Act's enactment given that no procedure exists for passive trusts to now obtain a license?

> Section 12-604 of the Courts and Judicial Proceedings Article (2020 Repl.; 2025 Supp.) permits this Court to reformulate certified questions. Because we believe that it is

---

[1] In this Court, Towd is designated as the appellant, and Ms. Bowman the appellee.

2

first necessary to address the predicate question of whether the Mortgage Lender Law required passive trusts to be licensed before the Secondary Market Stability Act became effective, we reformulate the certified questions as:

> 1. Did the Maryland Mortgage Lender Law require passive trusts to be licensed before the enactment of the Maryland Secondary Market Stability Act of 2025?
>
> 2. If so, did the provision of the Maryland Mortgage Lender Law exempting passive trusts from the licensure requirement, which was added by the Maryland Secondary Market Stability Act to "clarify" the licensing exemption after *Brown*, successfully restore the licensing exemption for passive trusts as if *Brown* had not been decided?
>
> 3. Assuming the Act merely exempts passive trusts from the licensing requirement as of the date it was enacted, are unlicensed passive trusts precluded from collecting interest and fees for the period prior to the Act's enactment?

In response to the first question, we hold that the Mortgage Lender Law did not require passive trusts to obtain licensure before the enactment of the Secondary Market Stability Act. *Brown* did not hold otherwise. Accordingly, we answer the first question "no," and therefore do not need to reach the other questions. Because *Brown* did not alter the Mortgage Lender Law's licensure requirement, there was no exemption to be restored to that statute by the Secondary Market Stability Act.

## BACKGROUND

### A. Legal Background

Our resolution of the legal question before us requires some understanding of three different Maryland laws regulating lenders: (1) the Maryland Mortgage Lender Law, Fin. Inst. §§ 11-501 – 11-524; (2) the Credit Grantor Revolving Credit Provisions, or OPEC,

which, when expressly invoked, governs open-end credit agreements, Md. Code Ann., Com. Law §§ 12-901 – 12-926 (2013 Repl.; 2025 Supp.); and (3) the Credit Grantor Closed End Credit Provisions, or CLEC, which, when expressly invoked, governs closed-end credit agreements, *id.* §§ 12-1001 – 12-1030.

### 1. The Maryland Mortgage Lender Law

The Maryland Mortgage Lender Law, located at Subtitle 5 of Title 11 of the Financial Institutions Article, "requires that a person obtain a license . . . to act as a mortgage lender." *Thompkins v. Mountaineer Invs., LLC*, 439 Md. 118, 124 n.3 (2014). Under that Law, "[a] person may not act as a mortgage lender . . . unless the person is: (1) A licensee; or (2) A person exempted from licensing under" the Law. Fin. Inst. § 11-504. The Mortgage Lender Law defines "mortgage lender" as "any person who: (i) Is a mortgage broker; (ii) Makes a mortgage loan to any person; or (iii) Is a mortgage servicer." *Id.* § 11-501(k)(1). Licensees are persons "licensed under" the Law "to engage in business as a mortgage lender." *Id.* § 11-501(g).

To obtain a license, an applicant must demonstrate to the Commissioner of Financial Regulation "good moral character" and "financial responsibility, business experience, and general fitness" according to standards set forth in the statute and in regulations. *Id.* § 11-506(a); *see also id.* §§ 11-503 (authorizing the Commissioner to "adopt rules and regulations to carry out the provisions of this subtitle[]"); 11-506(b) (requiring three years of experience in the mortgage lending business); 11-508 (requiring applicants to file a surety bond with the Commissioner); 11-508.1 (establishing lender net worth

4

requirements).  We refer to licenses issued under the Mortgage Lender Law as Mortgage Lender Licenses.

The Mortgage Lender Law provides that "[a]ny unlicensed person who is not exempt from licensing" under the Law "who makes or assists a borrower in obtaining a mortgage loan in violation of this subtitle may collect only the principal amount of the loan and may not collect any interest, costs, finder's fees, broker fees, or other charges with respect to the loan." *Id.* § 11-523(b).

The Mortgage Lender Law expressly exempts several categories of entities, including banks, insurance companies, corporate instrumentalities of the United States government, and real estate brokers. *See id.* § 11-502(b).  As we will discuss further below, following the enactment of the Maryland Secondary Mortgage Stability Act of 2025, the Mortgage Lender Law now expressly exempts passive trusts. *Id.* § 11-502(b)(13).

### 2. *OPEC and CLEC*

OPEC and CLEC are related statutes, located at Subtitles 9 and 10, respectively, of Title 12 of the Commercial Law Article.  OPEC governs certain open-end credit agreements, in which a borrower is authorized to borrow money as needed so long as the amount owed does not exceed a specified limit. *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 88 (2014).  CLEC governs certain closed-end credit agreements, in which the borrower immediately receives loan proceeds and repays the principal, along with interest and other charges, over time, usually in periodic installments, by a date certain. *Id.*

OPEC and CLEC apply to "credit grantors" who extend credit under those statutes. *See* Com. Law §§ 12-902; 12-1002. A credit grantor includes any "legal or commercial entity" that provides "a loan or other extension of credit" and is subject to state and federal regulatory requirements. *Id.* §§ 12-901(f)(1); 12-1001(g)(1). Under both statutes, the term credit grantor expressly includes assignees of a covered loan, or in the statutes' words, "[a]ny person who acquires or obtains the assignment of" a credit agreement under the statutes. *Id.* §§ 12-901(f)(2)(iii); 12-1001(g)(2)(iii).

OPEC and CLEC apply to loans only if the credit grantor expressly makes a "written election" for one of them to apply in the loan documents.[2] *Id.* §§ 12-913.1; 12-1013.1. OPEC and CLEC "do not apply" if the parties "fail[] to elect" them expressly. *Id.* §§ 12-913.1(b)(2); 12-1013.1(b)(2). If a credit grantor elects to use either OPEC or CLEC, then that statute applies to the exclusion of the other and several other credit regulatory schemes.[3] *Id.* §§ 12-913.1(b)(1); 12-1013.1(b)(1).

---

[2] OPEC, but not CLEC, applies without a written election only if the loan "[i]s a shared appreciation agreement[]" and "[a]llows the borrower to repay advances and have any repaid amounts subsequently readvanced to the borrower." Com. Law § 12-913.1(c).

[3] If OPEC or CLEC are elected, "the provisions of Subtitle 1, 3, 4, 5, [or] 6 . . . of this title do not apply to the plan." Com. Law §§ 12-913.1(b)(1); 12-1013.1(b)(1). Subtitle 1 is the Maryland Usury Law, *Nationstar Mortgage LLC v. Kemp*, 476 Md. 149, 158 (2021), which governs interest rates for consumer loans, *see* Com. Law §§ 12-101 – 12-128. Subtitle 3 consists of the Credit Provisions of the Maryland Consumer Loan Law. *See id.* §§ 12-301 – 12-319. Subtitle 4 contains the Maryland Secondary Mortgage Loan Law. *See id.* §§ 12-401 – 12-415. Subtitle 5 governs retail credit account agreements. *See id.* §§ 12-501 – 12-515. And Subtitle 6 regulates retail installment loan agreements. *See id.* §§ 12-601 – 12-636.

Where they are expressly invoked, OPEC and CLEC provide protections to consumer borrowers both at the time a loan is made and throughout the life of the loan, establish requirements for creditors, and create remedies for borrowers if a creditor fails to comply with the statutory requirements. *See Lyles v. Santander Consumer USA Inc.*, 478 Md. 588, 594 (2022) (discussing CLEC). The statutes permit a credit grantor to extend credit under an open-end or closed-end credit agreement while limiting the interest rate and fees the credit grantor may charge. Com. Law §§ 12-902 – 12-903; 12-1002 – 12-1003.

OPEC and CLEC each share two licensing requirements. The first, which applies to any credit grantor who makes a loan or extension of credit under OPEC or CLEC, requires compliance with "the licensing, investigatory, enforcement and penalty provisions of Title 11, Subtitle 3 of the Financial Institutions Article unless the credit grantor or the loan or extension of credit is exempt under" that Subtitle. Com. Law §§ 12-915(a); 12-1015(a). The license required under Subtitle 3 of Title 11 is "a license issued . . . under this subtitle to make installment loans," Fin. Inst. § 11-301(c), which include all loans made under OPEC and CLEC, *id.* § 11-301(b); *see id.* §§ 11-206 (explaining how to apply for an installment loan license); 11-303 (precluding any unlicensed person from engaging "in the business of making installment loans[]").

The second licensing requirement applies to a credit grantor who makes a loan or extension of credit under OPEC or CLEC that is "secured by any lien on residential real property[.]" Com. Law §§ 12-915(b); 12-1015(b). Such credit grantors must follow the "licensing, investigatory, enforcement and penalty provisions" of the Mortgage Lender

7

Law, unless an exemption to that law applies to the credit grantor. *Id.* §§ 12-915(b); 12-1015(b). In other words, such credit grantors must obtain a Mortgage Lender License.

If a "credit grantor violates any provision of" OPEC or CLEC, and no exemptions apply, the credit grantor may "collect only the principal amount" of the loan or credit extended. Com. Law §§ 12-918(a)(2); 12-1018(a)(2). Such a credit grantor "may not collect any interest, costs, fees, or other charges with respect to" the loan or extension of credit. *Id.*

### *3.* **Estate of Brown v. Ward**

The questions certified by the Bankruptcy Court require us to consider the Appellate Court's decision in *Estate of Brown v. Ward*, 261 Md. App. 385 (2024), the Office's interpretation of that decision, and the General Assembly's response. We will review each in some detail.

In *Brown*, Mr. Brown signed a home equity line of credit agreement secured by a deed of trust that permitted the lender to foreclose on his real property if he defaulted on the loan. *Id.* at 397-98. He later defaulted, was sued by the lender, declared bankruptcy, and passed away. *Id.* at 399-400. Years after Mr. Brown's death, a trust called FirstKey Master Funding, 2021-A Collateral Trust, U.S. Bank Trust National Association as Collateral Trust Trustee ("FirstKey") sent a notice of intent to foreclose on the property to Mr. Brown's estate, describing itself as the "secured party" in the deed of trust. *Id.* at 400-01.

8

After foreclosure proceedings began, Mr. Brown's estate alleged that FirstKey did not have the right to foreclose. *Id.* at 403. As pertinent here, the estate argued that FirstKey failed to obtain the requisite license under OPEC. *Id.* at 411. FirstKey conceded that it was unlicensed but argued that, as an assignee and a foreign statutory trust, no license was required. *Id.*

The Appellate Court agreed with the estate, concluding that OPEC required licensure of assignees and passive trusts like FirstKey. *Id.* at 420. In reaching its decision, the Appellate Court relied on this Court's opinion in *Nationstar Mortgage LLC v. Kemp*, 476 Md. 149 (2021). There, we addressed whether a provision of the Maryland Usury Law prohibiting a "lender" from charging certain property inspection fees applied to an assignee of a home mortgage loan. *Kemp*, 476 Md. at 168, 172; *see* Com. Law § 12-121(b) (forbidding "lenders" from imposing "a lender's inspection fee"). Notably, the definition of "lender" under the Usury Law—"a person who makes a loan under this subtitle"—did not specify whether it applied to an assignee. *Kemp*, 476 Md. at 172-73 (quoting Com. Law § 12-101(f)).

In *Kemp*, we concluded that the statutory definition of "lender" was "at best unclear" concerning its application to assignees. 476 Md. at 174. We reasoned that the Usury Law used the term "lender" in many provisions that apply over the lifetime of the loan, suggesting that it could apply to both the originator of the loan and assignees who held the loan over time. *Id.*; *see* Com. Law §§ 12-105(d) (prohibiting a "lender" from collecting fees on prepaid mortgages); 12-106(c) (requiring a "lender" to provide annual payment

9

statements that contain the principal amount due); 12-109.1(e) (outlining how a "lender" or "servicer" determines if a borrower must increase escrow payments for a first mortgage or deed of trust); 12-115 (explaining how a "lender" may repossess goods that secured the loan); 12-126(c) (requiring a "lender" to refund the borrower for any unearned precomputed interest if the borrower prepays the loan). We resolved the ambiguity by looking to common law principles of assignment. *Kemp*, 476 Md. at 155-58. We explained that, under the common law, an assignee "generally has the same rights and responsibilities as its assignor—no more, no less." *Id.* at 156. Because the statute expressed no intention to alter common law, *id.* at 177-78, and holding otherwise would weaken protections for borrowers by subjecting them to additional fees proscribed by the statute, *id.* at 186-87, we concluded that the definition of "lender" under the Maryland Usury Law includes assignees, *id.* at 187.

Returning to *Brown*, the Appellate Court held that FirstKey was required to obtain a Mortgage Lender License under OPEC. 261 Md. App. at 428-29. As noted above, OPEC requires a lender to obtain a Mortgage Lender License if the lender meets the definition of a credit grantor and the loan is secured by a lien on residential real property, "unless the credit grantor or the loan or extension of credit is exempt" under the Mortgage Lender Law. Com. Law § 12-915(b). FirstKey acknowledged that it met the statutory definition of a credit grantor under OPEC. *Brown*, 261 Md. App. at 418-19. FirstKey noted, however, that OPEC imposes the licensure requirement only on "a credit grantor *making a loan or extension of credit under this subtitle*[,]" and it had not made a loan or an extension of

10

credit to Mr. Brown; rather, it had been assigned the loan. *Id.* at 419 (quoting Com. Law § 12-915(b)). Similarly, FirstKey argued that passive trusts are not required to be licensed because they merely hold mortgages that were extended by others, and do not make loans or extend credit themselves. *Brown*, 261 Md. App. at 419.

The Appellate Court rejected both arguments. The court observed that FirstKey conceded that it met the definition of a credit grantor under OPEC. *Id.* at 418-19. And because OPEC expressly defines "credit grantor" to include assignees, FirstKey's status as an assignee was no defense. *Id.* at 418-22. FirstKey's status as a passive trust also provided no defense because the Mortgage Lender Law did not contain an exemption for passive trusts. *Id.* at 424-25. Moreover, like the Usury Law construed in *Kemp*, OPEC's provisions govern the lifetime of the loan, not just the origination. *Id.* at 421. To the Appellate Court, excusing assignees or passive trusts from statutory requirements designed to protect borrowers would create significant loopholes in OPEC's ability to protect consumers. *Id.* at 422.

Notably, the Appellate Court expressly disclaimed any opinion concerning whether FirstKey would have been independently required to obtain a Mortgage Lender License under the Mortgage Lender Law, which applies to "mortgage lenders," rather than "credit grantors." *Id.* at 423-24. In its brief, FirstKey had argued that the Mortgage Lender Law did not require it to be licensed because it was not a "mortgage lender" as defined in that law, and because "the licensing requirements of the Maryland Mortgage Lender Law 'do not apply' to any 'foreign statutory trust.'" *Id.* at 424. The Appellate Court found that

11

argument to be irrelevant because the issue before it was not whether FirstKey was required to be licensed under the Mortgage Lender Law, but whether it was required to be licensed under OPEC. *Id.* Thus, "[t]he conclusion that a trust merely owning a defaulted mortgage loan is not a 'mortgage lender' within the meaning of [the Mortgage Lender Law] does not answer the question of whether a trust might be subject to the licensing requirements imposed on a 'credit grantor' by [OPEC]."[4] *Id.* at 425.

### 4. The Office's Guidance and the Maryland Secondary Market Stability Act of 2025

Although *Brown* applied only to OPEC, and expressly disavowed any direct application to the Mortgage Lender Law, the Office of Financial Regulation interpreted the reasoning in *Brown* to apply to all mortgage loans. Accordingly, soon after the Appellate Court decided *Brown*, the Office issued "formal guidance to clarify the applicability of licensing requirements under Maryland law for persons engaged in mortgage lending,

---

[4] The Appellate Court observed that even if it were to consider whether there was an independent obligation to be licensed under the Mortgage Lender Law, it did not find persuasive a line of federal cases on which FirstKey relied. *Brown*, 261 Md. App. at 424-25; *see Suazo v. U.S. Bank Trust, NA*, No. RDB-18-1451, 2019 WL 4673450, at *7-8 (D. Md. Sep. 25, 2019) (unreported). The court reasoned that although those cases held that foreign trusts are not "mortgage lenders" under the Mortgage Lender Law, they did not discuss OPEC. *Brown*, 261 Md. App. at 425. The court also pointed out that we found *Suazo* and the cases relying on it unpersuasive in our analysis of the Maryland Usury Law in *Kemp*. *Brown*, 261 Md. App. at 425-26; *see Kemp*, 476 Md. at 186 n.48 ("The court in *Suazo* and the related cases did not consider the Maryland common law concerning assignment of mortgages, the structure of the Maryland Usury Law, the fact that the addition of [Com. Law] § 12-101(f) was part of a non-substantive code revision of that law, or the consequence that its interpretation would exempt an assignee of a loan from most of the Usury Law. . . . Accordingly, we do not find *Suazo* or the cases that repeated its analysis to be persuasive.").

including mortgage trusts and their assignees."  Md. Comm'r of Fin. Reg., *Guidance on Licensing Requirements for Mortgage Trusts and Notice of Emergency Regulations* 1 (Jan. 10, 2025).  The Office "promulgated emergency regulations" so that "mortgage trusts can obtain appropriate licensure and satisfy statutory requirements without undue burden."  *Id.*  The emergency regulations "enabled mortgage trust licensing" by outlining the procedures a passive trust should follow to obtain licensure, as the Office had not previously licensed passive trusts.[5]  *Id.* at 3 (citation modified).

One month later, the Office alerted that "industry stakeholders have expressed concerns that the licensing requirements create unique challenges for passive trusts and the role they serve by providing liquidity to the mortgage market.  Some industry members have responded by suspending mortgage operations in Maryland, with others indicating they may follow."  Md. Comm'r of Fin. Reg., *Maryland Secondary Market Stability Act of 2025 and Extension of Enforcement Deadline* 1 (Feb. 18, 2025).  To address those concerns, the Office explained, it had "collaborated with industry representatives to develop proposed legislation, the Maryland Secondary Market Stability Act of 2025[.]"  *Id.* (emphasis omitted).  The Office elaborated that the legislation "is designed to provide a licensing exemption" for assignees, including passive trusts.  *Id.*

---

[5] Among other things, the regulations permitted passive trusts to designate a trustee to serve as the "qualifying individual" to obtain licensure.  *See* 52:1 Md. Reg. 28-29 (Jan. 10, 2025) (proposed regulations); *id.* at 17 (granting emergency status to those regulations).

The primary sponsor of the Secondary Market Stability Act in the Maryland Senate, Senator Pamela Beidle, argued that the Act "will help restore stability to the mortgage market[.]" Testimony of Sen. Pamela Beidle, S.B. 1026, 447th Gen. Assemb., Reg. Sess. at 1 (Mar. 11, 2025). Echoing the Office's interpretation of *Brown*, Senator Beidle testified that adoption of the Act would return the market "to the position in which it existed prior to the *Brown* decision[]" by exempting passive trusts "from licensure[.]" *Id.*

The Office made similar points in its written testimony. *See* Testimony of Off. of Fin. Reg., S.B. 1026, 447th Gen. Assemb., Reg. Sess. (Mar. 11, 2025). It contended that *Brown* represented "a significant shift" in licensing requirements by requiring the licensure of "passive trusts that hold mortgage loans[.]" *Id.* at 1. The Office expressed concerns about both (1) the ongoing disruption of "mortgage and other consumer lending" in Maryland, and (2) the unprecedented burden that would be placed on the Office to "oversee the licensing and examination of thousands of passive trusts[.]" *Id.*

The General Assembly adopted the Secondary Market Stability Act as emergency legislation, 2025 Md. Laws, Ch. 119 § 4, effective upon signature by the Governor, *see Himmighoefer v. Medallion Inds., Inc.*, 302 Md. 270, 275 (1985). The Act made three pertinent changes relevant to a "passive trust," which it defined as a trust that: "(1) Acquires or is assigned mortgage loans in whole or in part; (2) Does not make mortgage loans; (3) Is not a mortgage broker or a mortgage servicer; and (4) Is not engaged in the servicing of mortgage loans, which does not include the act of transmitting or

14

directing payments received by a mortgage servicer."  2025 Md. Laws, Ch. 119 § 1, codified at Fin. Inst. § 11-501(p).

First, the Secondary Market Stability Act added "a passive trust" to the list of entities exempt from the Mortgage Lender Law.  2025 Md. Laws, Ch. 119 § 1, codified at Fin. Inst. § 11-502(b)(13).  Second, it proclaimed that OPEC's licensing requirement applicable to credit grantors who make installment loans does not apply to passive trusts. *See* 2025 Md. Laws, Ch. 119 § 1, codified at Fin. Inst. § 11-302(b)(8) (providing that licensing requirement does not apply to entities exempt by Financial Institutions § 11-502(b)(13), which identifies passive trusts).  Third, the Act added a new provision stating that, apart from one exception, the entirety of Title 11 of the Financial Institutions Article does not apply to "a person that acquires or is assigned" the following:

- "A mortgage, if the person does not otherwise make mortgages;"

- "A mortgage loan . . . if the person does not otherwise engage in the mortgage lending business[]"; or

- "An installment loan, if the person" relies on another to "service or collect" the loan and "[d]oes not otherwise make installment loans."

2025 Md. Laws, Ch. 119 § 1, codified at Fin. Inst. § 11-102(b).  The one exception identified in § 11-102(b) is for § 11-219, a provision in the Maryland Consumer Loan Law that states that "[a] licensee may not sell a loan account to any person who is not licensed under this subtitle[]" and provides that a loan acquired by an unlicensed person "is not enforceable."  Fin. Inst. § 11-219.

15

The Act also contains an uncodified § 3, which states that "the intent of Section 1 of this Act is to clarify existing exemptions under State law." 2025 Md. Laws, Ch. 119 § 3.

## B.    Factual Background

When answering a certified question, we "accept[] the facts provided by the certifying court." *United Bank v. Buckingham*, 472 Md. 407, 413 (2021). Those facts are:

> Scarlett Bowman owns a piece of residential property in Mount Airy, Maryland. In 2006, [Ms. Bowman] obtained a home mortgage loan evidenced by a note and deed of trust. On May 5, 2021, the Loan was assigned to Towd Point Mortgage Trust 2016-4, U.S. Bank National Association as Indenture Trustee. Towd filed a proof of claim in this bankruptcy case which claims, *inter alia*, interest and fees due under the Loan. Over the life of the Loan, Towd has applied payments toward interest, fees, and other charges in addition to principal.
>
> [Ms. Bowman's] objection challenges Towd's authority to apply loan payments it collected to interest, fees, and other charges because Towd is not licensed under the Maryland Mortgage Lender Law, Md. Code Ann., Fin. Inst. §§ 11-501 – 11-524. It is not disputed that Towd did not obtain a license, but the parties disagree that a license was required.

(Citations and defined terms omitted).

## DISCUSSION

This Court may answer questions certified to it pursuant to the Maryland Uniform Certification of Questions of Law Act. *See* Cts. & Jud. Proc. §§ 12-601 – 12-613. "The court certifying a question of law to the Supreme Court of Maryland . . . shall issue a certification order and forward it to" this Court. *Id.* § 12-605(a); *see* Md. Rule 8-305 (explaining how another court certifies questions to this Court). We "may answer a

16

question of law certified . . . by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Cts. & Jud. Proc. § 12-603.

In its certification order, the Bankruptcy Court stated that, "[a]t bottom of this dispute is whether Towd was required to be licensed" under the Mortgage Lender Law "before the [Secondary Market Stability] Act was signed into law." We agree, and believe that it is necessary to address that predicate question first.

## I. THE LAW RELEVANT TO THE CERTIFIED QUESTIONS IS THE MARYLAND MORTGAGE LENDER LAW, WHICH *BROWN* DID NOT INTERPRET OR APPLY.

At the outset, it is important to clarify two points. First, as this case is presented here, the Mortgage Lender Law is the law applicable to the certified questions. The basis of Ms. Bowman's objection to Towd's claim is that Towd was not licensed under the Mortgage Lender Law. And although the certification order mentions the possible applicability of CLEC, the loan documentation provided to this Court does not contain a "written election" of CLEC, and nothing else in the record before us suggests that CLEC might be applicable. Com. Law § 12-1013.1(a)(2); *see Patton v. Wells Fargo Fin. Md.*, 437 Md. 83, 89 (2014) ("If the lender elects CLEC, it is to do so by written election in the loan contract.").

Ms. Bowman nonetheless asks us to go beyond the application of the Mortgage Lender Law and opine on the effect of the Secondary Market Stability Act with respect to

17

both CLEC and OPEC. However, it does not appear that an opinion concerning CLEC or OPEC "may be determinative of an issue in pending litigation in the certifying court[.]" Cts. & Jud. Proc. § 12-603. Any such opinion would, therefore, exceed the authority provided by the Uniform Certification of Questions of Law Act. Moreover, any such opinion would constitute a "purely advisory opinion[]" on a question that does not appear to be presented on these facts, which is "a long forbidden practice in this State." *Pizza di Joey, LLC v. Mayor & City Council of Baltimore*, 470 Md. 308, 340 (2020) (quoting *Hickory Point P'ship v. Anne Arundel County*, 316 Md. 118, 129-30 (1989)). Accordingly, our analysis is limited to the Mortgage Lender Law. The resolution of any open questions about licensure requirements under OPEC or CLEC before or after the effective date of the Secondary Market Stability Act will need to await a case presenting those questions.

Second, the Appellate Court's decision in *Brown* did not purport to interpret or apply the Mortgage Lender Law, nor did its holding have any necessary implications for the interpretation of the Mortgage Lender Law. As discussed above, *Brown* turned on OPEC's requirement that credit grantors who make covered loans that are "secured by any lien on residential real property" obtain a Mortgage Lender License, unless specifically exempted from licensure under the Mortgage Lender Law. The Mortgage Lender Law is fundamentally different than OPEC and it applies not to credit grantors, but to mortgage lenders, as separately defined in that Law. The Appellate Court's decision in *Brown* does not analyze the Mortgage Lender Law or whether an assignee or passive trust can be a mortgage lender under it.

18

To be sure, the OPEC licensing requirement for credit grantors who make loans secured by real property intersects with the Mortgage Lender Law's licensing requirement in two ways. First, whether the requirement to obtain a license arises under OPEC or the Mortgage Lender Law, the license itself is the same. Rather than create a new licensure scheme, OPEC borrowed that of the Mortgage Lender Law. Com. Law § 12-915(b). Second, OPEC also adopts by reference the express exemptions contained within the Mortgage Lender Law. *Id.* But neither of those provisions collapses the distinctions between the two requirements to obtain Mortgage Lender Licenses. The OPEC requirement arises under that statutory scheme and turns on whether the entity at issue is a credit grantor under OPEC. The Mortgage Lender Law requirement arises under its different statutory scheme and turns on whether the entity at issue is a mortgage lender under that Law. As we will discuss, those schemes and terms are not equivalent.

In sum, answering the certified questions requires us to determine whether passive trusts are required to be licensed under the Maryland Mortgage Lender Law and only that Law. The Appellate Court's decision in *Brown* did not address or answer that question, either directly or necessarily.

## II. THE MORTGAGE LENDER LAW DID NOT REQUIRE PASSIVE TRUSTS TO OBTAIN A LICENSE BEFORE THE ENACTMENT OF THE SECONDARY MARKET STABILITY ACT.

Addressing a question of first impression, we must determine whether the Mortgage Lender Law required licensure of a passive trust before the passage of the Secondary

Market Stability Act. If it did, the question then becomes whether the Secondary Market Stability Act applied retroactively.

To interpret the Mortgage Lender Law, we employ our traditional tools of statutory construction. "The goal of statutory construction is to discern and carry out the intent of the Legislature." *Engage Armament LLC v. Montgomery County*, 494 Md. 1, 35 (2026) (quoting *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024)). We begin with the text, which we view wholistically and in its full context, employing available tools for textual analysis. *Id.* "Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law, we also seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (quoting *Westminster Mgmt.*, 486 Md. at 644-45). If a statute is ambiguous either inherently or in context, we search for legislative intent in other indicia, including "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it." *Id.* at 36 (quoting *Westminster Mgmt.*, 486 Md. at 645). "[I]n every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Id.* (quoting *Westminster Mgmt.*, 486 Md. at 646).

As relevant here, we find the plain language of the Mortgage Lender Law to be unambiguous. It does not require licensure of passive trusts. The Law's provisions requiring licensure apply to "mortgage lenders," defined to include any person who makes a mortgage loan or is a mortgage broker or servicer. *See* Fin. Inst. §§ 11-501(k)(1)

20

(defining "mortgage lender"); 11-504 (prohibiting a person from acting as a mortgage lender unless licensed or "exempted from licensing under this subtitle"). A passive trust, as the term implies and as it is now defined in statute, does none of those things. The General Assembly added a definition of "Passive trust" to the Mortgage Lender Law through the Secondary Market Stability Act of 2025, defining it as a trust that:

(1) Acquires or is assigned mortgage loans in whole or in part;

(2) Does not make mortgage loans;

(3) Is not a mortgage broker or a mortgage servicer; and

(4) Is not engaged in the servicing of mortgage loans, which does not include the act of transmitting or directing payments received by a mortgage servicer.

*Id.* § 11-501(p). The General Assembly thus defines "passive trust" as an entity that holds a mortgage loan but does none of the only three things that would make it a mortgage lender. And unlike OPEC, which expressly includes assignees of a loan within the definition of credit grantor, Com. Law § 12-901(f)(2)(iii), the Mortgage Lender Law does not include assignees within the definition of a mortgage lender, Fin. Inst. § 11-501(k)(1).

Moreover, unlike OPEC, which includes provisions regulating the full lifecycle of a loan, *see* Com. Law §§ 12-902 – 12-903, the Mortgage Lender Law does not, *see, e.g.*, Fin. Inst. § 11-504 (regulating who can act as a mortgage lender); *id.* § 11-506 (outlining qualifications to obtain a Mortgage Lender License). There is thus no disconnect between the plain language of the licensure requirement and the General Assembly's intent to protect consumers. The penalty provisions of those statutory schemes also reflect that fundamental difference between them. Both penalty provisions forbid the collection of

21

interest, costs, and fees for violations. However, the penalty provision of OPEC applies when a "credit grantor violates *any* provision of this subtitle[,]" presumably including the requirement to be licensed. Com. Law § 12-918(a)(2) (emphasis added). By contrast, the penalty provision of the Mortgage Lender Law applies only to an "unlicensed person who is not exempt from licensing . . . who makes or assists a borrower in obtaining a mortgage loan in violation of this subtitle[.]" Fin. Inst. § 11-523(b).

In sum, the plain language of the Mortgage Lender Law requires a license only for persons who engage in the activity of being a mortgage broker, making a mortgage loan, or being a mortgage servicer. Fin. Inst. § 11-501(k)(1). That plain language does not extend to an entity that merely holds a mortgage loan. And unlike the Usury Law analyzed in *Kemp* or OPEC, no other provision of the Mortgage Lender Law's statutory scheme renders that language ambiguous. Based on its plain language, the Mortgage Lender Law therefore does not, and before adoption of the Secondary Market Stability Act did not, apply to assignees of mortgage loans that are passive trusts.

The subsequent statutory history of the Mortgage Lender Law also supports our plain language interpretation. *See Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 567 (2025) (looking to a "statute's relationship to . . . subsequent legislation" because it may "assist this Court in narrowing the purpose and scope" of that statute (quoting *Blackstone v. Sharma*, 461 Md. 87, 135 (2018))). In adding an express exemption to the Mortgage Lender Law for passive trusts, and by defining passive trusts to be entities that do not do any of the things that would make an entity a mortgage lender, the General

22

Assembly manifested its intent to "clarify existing exemptions under" the law, not change it. 2025 Md. Laws, Ch. 119 § 3. Although not definitive, that is a strong indication that, at least in 2025, the General Assembly did not believe the Mortgage Lender Law had applied to passive trusts even before the Secondary Market Stability Act.

Ms. Bowman and amici argue that this plain language interpretation of the Mortgage Lender Law conflicts with the common law principle on which we relied in *Kemp* and the Appellate Court relied in *Brown* that "an assignee generally has the same rights and responsibilities as its assignor[.]" *See Kemp*, 476 Md. at 156. However, in both *Brown* and *Kemp*, the courts invoked common law principles to resolve ambiguities. *See Brown*, 261 Md. App. at 420 (concluding that the phrase "making a loan or extension of credit under this subtitle" is ambiguous in the context of a statute defining credit grantor to include assignees and containing provisions that apply both at loan origination and over the lifetime of a loan); *Kemp*, 476 Md. at 172-74 (concluding that, "viewed in the context of its usage throughout the Usury Law, the term [lender] is ambiguous[]"). Where the General Assembly has unambiguously identified its intent in the plain language of the statutory scheme, we will not resort to background common law principles to contradict that intent. *See Engage Armament*, 494 Md. at 36 (explaining that if a statue is unambiguous, "our inquiry generally ceases at that point and we apply the statute as written[]" (quoting *Westminster Mgmt.*, 486 Md. at 645)).

Ms. Bowman also relies on a separate provision of the Secondary Market Stability Act, which added a new § 11-102 to the Financial Institutions Article, as follows:

23

(a) In this section, "installment loan" has the meaning stated in § 11-301 of this title.

(b) Except for § 11-219 of this title, this title does not apply to a person that acquires or is assigned in whole or in part:

> (1) A mortgage, if the person does not otherwise make mortgages;

> (2) A mortgage loan, as defined in § 11-501 of this title, if the person does not otherwise engage in the mortgage lending business, as defined in § 11-501 of this title; or

> (3) An installment loan, if the person:

>> (i) Relies on another person to service or collect on the installment loan; and

>> (ii) Does not otherwise make installment loans.

Ms. Bowman's argument focuses on the language excepting § 11-219 from the general inapplicability of Title 11 to passive trusts. Section 11-219 provides, in full:

> (a) A licensee may not sell a loan account to any person who is not licensed under this subtitle.

> (b) A loan account that is acquired by a person who is not licensed under this subtitle is not enforceable.

In her brief, Ms. Bowman argues that the combination of §§ 11-102(b) and 11-219 means that although passive trusts are not required to obtain licenses, licensed entities may not assign loans to unlicensed individuals, and any loans so assigned are not enforceable.[6]

---

[6] To the extent that Ms. Bowman argues that § 11-102(b) supports her argument that the Secondary Market Stability Act is not retroactive, we need not reach that question because we conclude that the Mortgage Lender Law did not require licensure for passive trusts before or after passage of that Act.

24

Ms. Bowman's argument is premised on an understanding that § 11-219 applies to all mortgage loans. We interpret the statute differently. Section 11-219 prohibits the sale of a "loan account" to a person "not licensed under" Subtitle 2 of Title 11. That subtitle contains the licensing provisions of the Maryland Consumer Loan Law, Fin. Inst. § 11-223(a), and it defines "loan" as "any loan or advance of money or credit subject to Title 12, Subtitle 3 of the Commercial Law Article," *id.* § 11-201(g). In turn, Title 12, Subtitle 3 applies only to "a loan of $25,000 or less made for personal, family, or household purposes." Com. Law § 12-303(a)(1); *see also id.* § 12-303(b) ("A lender may not make a loan subject to this subtitle unless the loan is in an original amount or value which does not exceed $25,000."). Reading these provisions together, § 11-219 does not apply to the Mortgage Lender Law.

Ms. Bowman's purported interpretation of the intersection between the new § 11-102(b) and § 11-219 is also manifestly inconsistent with the clear purpose of the Secondary Market Stability Act, which was to allow passive trusts to hold mortgages without requiring a license under the Mortgage Lender Law.

In sum, the Mortgage Lender Law did not require passive trusts to obtain a Mortgage Lender License before or following the effective date of the Secondary Market Stability Act. The Appellate Court's decision in *Brown* was limited to licensure obligations under OPEC and did not apply directly or necessarily to licensure obligations under the Mortgage Lender Law.

25

**CONCLUSION**

As reformulated, the first certified question is: "Did the Maryland Mortgage Lender Law require passive trusts to be licensed before the enactment of the Maryland Secondary Market Stability Act of 2025?" We answer that question "no."

The second question asks whether the Secondary Market Stability Act "successfully restore[d] the licensing exemption for passive trusts as if *Brown* had not been decided." At least with respect to the Mortgage Lender Law, there was nothing to restore because the licensing requirement in that Law never applied to passive trusts. The third question assumes that the Secondary Market Stability Act exempts passive trusts from licensing requirements only as of the date it was enacted. But that is not our conclusion. Accordingly, we need not answer the second and third certified questions.

> **CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

26